**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| STRATEGIC TECHNOLOGIES, | ) | |
| PTE, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-2311 |
| v. | ) | Judge: Rosemary M. Collyer |
| | ) | |
| REPUBLIC OF CHINA (TAIWAN) | ) | |
| | ) | |
| Defendant. | ) | |

**REPLY**
**IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT**

Contrary to Strategic Tech's suggestion (Dkt. 17 at 8-9), the ROC agrees with Strategic Tech that the ROC bears the burden of proving that Strategic Tech's allegations do not bring its case within a statutory exception to immunity.  Nor has the ROC made any attempt to "enhance Strategic Tech's pleading burdens by merely questioning the truth of some of the allegations . . ," an accusation not followed by any specific citation to the ROC's filings. (*See id.* at 8).  The ROC does not question the truth of any *factual* allegation in the Amended Complaint for purposes of this motion.  Even so assuming, Strategic Tech has failed to allege a basis for subject matter jurisdiction under either of the two exceptions invoked, the implied waiver and the commercial activity exceptions of the FSIA.

**I.      The Amended Complaint does not allege a basis for subject matter jurisdiction under the waiver exception.**

As the ROC argued, *Creighton Ltd. v. Government of Qatar,* 181 F.3d 118 (D.C. Cir. 1999), is controlling in this case.  (Dkt. 14 at 3-4).  There, the court of appeals rejected Creighton's argument, citing cases, that, by agreeing to arbitrate in France, a signatory to the New York

Convention, Qatar, although not itself a party to the Convention, had waived its immunity in U.S. courts because France and the United States were parties to the Convention. The ROC argued, "'In each of those cases [cited by Creighton]. . .the defendant sovereign was (unlike Qatar) a signatory of the Convention. . . . Qatar not having signed the Convention, we do not think that its agreement to arbitrate in a signatory country, without more, demonstrates the requisite intent to waive its sovereign immunity in the United States.' *Id.* at 123." (Dkt. 14 at 4, quoting *Creighton*).

Strategic Tech contends that in this case there is more evidence of intent. Provisions in Section 25 of the Contract, "taken together, show an unmistakable intent to allow the ROC to be treated like any other commercial party with respect to its rights and obligations under the Contract and thus waive immunity from enforcement of the Contract." (Dkt. 17 at 14-15). The three provisions, however, add nothing to the factors considered in *Creighton.*

Section 25.1 of the Contract provides:

All disputes, claims or controversies arising under or in connection with the Contact shall be reduced to writing by the disputing party and notified to the other party. The decision of the disputing party contained in such notice shall be final and conclusive unless within thirty (30) days from the receipt of such notice the other party furnishes to the disputing party written rejection thereof, in which case the disagreement will be submitted to arbitration.

This section makes no mention of negotiation, as Strategic Tech contends. (Dkt. 17 at 13). It simply provides that, if there is a disagreement, it shall be reduced to writing and, if not resolved, submitted to arbitration. In *Creighton,* the contract also provided for arbitration. Section 25.1 adds nothing new on intent to waive immunity.

Section 25.2 provides:

The arbitration shall take place in Taipei, R.O.C., in accordance with the R.O.C. Commercial Arbitration Act if initiated by the Seller and in the Seller's country in accordance with the applicable rules of the Seller's country if initiated by the Buyer.

This venue and choice of law provision also adds nothing to *Creighton*.  In that case, Qatar agreed to arbitration in France.  France, unlike the ROC, is a signatory to the New York Convention, which provides that any arbitration that takes place in a signatory country is enforceable in any other.  The *Creighton* court rejected the argument that an agreement to arbitrate by a non-signatory state in a signatory state waives immunity from enforcement in U.S. courts.  In consequence, it adds nothing to *Creighton* to say that the ROC agreed to arbitrate in Singapore, a signatory state.

Indeed, we submit that agreement by a non-signatory to arbitrate in a signatory state does not even *tend* to show an intent to waive immunity in a third state.  As Qatar argued in *Creighton* and the court agreed*,* "the FSIA and decisions applying it make clear that a sovereign's agreement to arbitrate in a New York Convention state is not a waiver of immunity to suit in the U.S. unless the foreign sovereign is also party to the New York Convention."  *Id.* at 122.  Choosing an arbitration forum generally known not to waive immunity in a third state (because the chooser is not a signatory to the New York Convention) is at least *some* evidence, we submit, of the chooser's  intent *not* to waive immunity in a third state.

As for the provision for arbitration in the ROC, the argument for intent to waive is even weaker because the ROC is not a signatory to the Convention.   Standing alone an agreement to arbitrate domestically is stronger evidence of an intent not to waive than agreement by a non-signatory to arbitrate in a signatory state.  An agreement by a state to arbitrate within its own borders clearly does not show an intent to waive outside the state.  On the contrary. *Creighton*, we submit, would not have been decided any differently if Qatar gave Creighton two choices, arbitration in France or Qatar.   To the extent that the Qatar option would have made a difference, it would tend to show no intention to waive in a third state.

Nor does it add anything to say that the arbitration would have been either under "normal ROC Commercial Arbitration law" or "in accordance with Singapore law."  (Dkt. 17 at 13).   The arbitration in *Creighton* was under "the Rules of Conciliation and Arbitration of the International Chamber of Commerce."    *Id.* at 120.    These are also "normal" commercial rules.[1]

Thus, Section 25.2 likewise adds nothing to the factors considered in *Creighton.*  It subtracts.

Finally, Section 25.4 provides:

The decision of the arbitrator shall be final and binding.

However, so was the award in *Creighton.*  The Supreme Court of France rejected an attempt to set aside the results of the arbitration as invalid under French law.  *Id.* at 120.  There is no suggestion in *Creighton* that the award was not "final and binding."

More generally, we find nothing in any of these provisions showing the slightest intent to waive sovereign immunity in the United States.  As the court of appeals stated in *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 444 (D.C. Cir. 1990), and repeated in *Creighton, supra*, at 122, "courts rarely find that a nation has waived its sovereign immunity ... without strong evidence that this is what the foreign state intended."  Section 25 makes no mention of waiver of sovereign immunity in U.S. courts – indeed in makes no reference to the United States at all – nor is there anything in the section that may be fairly said to imply an intention to make such a waiver.

Strategic Tech cites two cases from this Court (Dkt. 17 at 15), *Energoinvest DD v. Democratic Republic of Congo,* 355 F. Supp. 2d 9, 11 (D.D.C. 2004), and *Birch Shipping Corp. v. Embassy of United Republic of Tanzania,* 507 F. Supp. 311, 312 (D.D.C. 1980), in support of its

---

[1] *See* Rules of Arbitration, International Chamber of Commerce, www.iccwbo.org.

position that a nation's agreement to arbitrate in a country other than itself (and other than in the

United States) implies waiver of immunity in the United States.  However, in *Birch,* Tanzania not

only had agreed to arbitrate in New York but also to entry of judgment there.  *Id.*   True the opinion

does state, citing the legislative history, that an agreement to arbitrate, "standing alone," waives

sovereign immunity, but it is *dictum.*  Tanzania had agree to arbitrate *in New York.*   The court also

noted that "an agreement to entry of judgment reinforces any waiver."   *Id.*   Tanzania had also

agreed to the jurisdiction of the *New York* enforcing court.[2]   In *Energoinvest,* the defendant did not

appear.    Apparently, no one brought to that court's attention the court of appeals' decision in

*Creighton*, which is not mentioned in the opinion.

Both *Birch* and *Energoinvest* rely on a 1978 case from this Court, *Ipitrade International S.A.*

*v. Federal Republic of Nigeria*, 465 F. Supp. 824 (D.D.C. 1978), in which this Court ruled that an

agreement to arbitrate waived immunity relying in part on the "legislative history of this section

[which] expressly states that an agreement to arbitrate or to submit to the laws of another country

constitutes an implicit waiver," citing House Report No. 94-1487, at 18 (1976).   There, the state

in question, Nigeria, was a party to the New York Convention.  In 2000, however, in *Creighton,* the

D.C. Circuit rejected sole reliance on the legislative history in light of circuit court and Supreme

Court jurisprudence.  The court wrote:

> The closest Creighton comes to arguing that Qatar intended to waive its sovereign

---

[2] An agreement to arbitrate in a particular jurisdiction has been held to (1) waive sovereign immunity and (2) waive any objection to personal jurisdiction in that jurisdiction.  *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes,* 336 F.2d 354, 363 (2d Cir. 1964) ("By agreeing to arbitrate in New York, where the United States Arbitration Act makes such agreements specifically enforceable, the [government of Spain] must be deemed to have consented to the jurisdiction of the court that could compel the arbitration proceeding in New York. To hold otherwise would be to render the arbitration clause a nullity").

immunity is in pointing to this statement in the House Report accompanying the FSIA: 'the courts have found [implicit] waivers in cases where a foreign state has agreed to arbitration in another country.' H.R. Rep. No. 94-1487, at 18 (1976) . . . Creighton claims Qatar's agreement to arbitrate in France should be deemed an implicit waiver of its sovereign immunity in U.S. courts. . . .

We follow the Second Circuit in rejecting such a broad reading of the 'implicit waiver' exception.'

If the language of the legislative history [were] applied literally, a foreign government would be subject to the United States' jurisdiction simply because it agreed to have the contract governed by another country's laws, or agreed to arbitrate in a country other than itself, even though the agreement made no reference to the United States. Such an interpretation of § 1605 (a)(1)'s 'implicit waiver' exception could vastly increase the jurisdiction of the federal courts over matters involving sensitive foreign relations. *Seetransport Wiking Trader v. Navimpex Centrala Navala,* 989 F.2d 572, 577 (2d Cir. 1993)[also citing, *see also,* numerous other cases]. [*Creighton, supra*, at 122]

The *Creighton* court specifically addressed and rejected Crieghton's reliance on *Ipitrade* because the foreign state at issue in *Ipitrade,* Nigeria, was a signatory to the New York Convention whereas the foreign state at issue in *Creighton*, Qatar, was not. *Id.* at 123 ("Qatar not having signed the Convention, we do not think that its agreement to arbitrate in a signatory country, without more, demonstrates the requisite intent to waive its sovereign immunity in the United States.").[3]   In consequence, it is established in this Circuit that just an agreement to arbitrate is not sufficient to waive immunity in U.S. courts.

The ROC's final argument on waiver was that there was no allegation in the Amended Complaint from which it could be inferred  - under the particular circumstances of the case - that the

---

[3] We do not agree either with the standard proposed or the conclusion in footnote 8. (Dkt. 17 at 15). The standard is not "whether the terms of the agreement - the facts at issue - show an intent to allow enforcement of the Contract against the ROC." *Id.* The standard is whether the foreign state has "intended to waive its sovereign immunity." *Creighton*, *supra*, at 122. Section 25 of the Contract, which "ma[kes] no reference to the United States," *see Creighton, supra,* quoting *Seetransport*, *supra,* does not remotely indicate any such intent.

ROC agreed to arbitration or enforcement in a foreign state as a matter of contract interpretation. The ROC wrote:

> ... According to the Amended Complaint, ¶9, the Contract provides that "should the ROC initiate arbitration ... such proceedings would occur outside the ROC, ... [and] results of such proceedings would be final and binding." (Emphasis added.)  The Amended Complaint, however, does not allege that the ROC initiated arbitration thereby agreeing to enforcement in a foreign state. (Dkt. 14 at 5).  Qatar [the defendant in *Creighton, supra*] in fact agreed to arbitrate in a foreign state and in fact did so.  Based on the Amended Complaint, the ROC did not.  (Dkt. 14 at 5, footnote omitted)

Strategic Tech characterizes this argument as "unique."  The ROC, as Strategic Tech would have it, argues that, even though it has "explicitly agree[d] to the arbitration of disputes and that the outcome of any such proceeding – whether initiated by the ROC or Strategic Tech – will bind the ROC," "because it did not itself initiate an arbitration proceeding, it did not *really* agree to the arbitration of any disputes."  (Dkt. 17 at 15, emphasis in original).   The ROC's point, however, was not that "it did not itself" initiate an arbitration proceeding.   Its point was there is no allegation in the Amended Complaint that either party initiated arbitration.

Being more specific, nowhere in the Amended Complaint is there an allegation that arbitration was initiated as set out in Article 25.2 of the Contract, that is, either that the ROC initiated an arbitration in Singapore or that Strategic Tech did so in the ROC.  Indeed, the Amended Complaint does not allege that there ever was an arbitration.  Even assuming that a contract to arbitrate under certain conditions would demonstrate an intent to waive sovereign immunity in U.S. courts, there would be no waiver if the conditions of the contract were not met.  An intent to waive immunity under one set of circumstances is not an intent to waive under all.

"Unique" or not, we respectfully submit, this argument by itself is dispositive on waiver. That is, even if Section 25 of the Contract waived the ROC's immunity in U.S. courts had one party

or the other initiated arbitration as set out in Section 25, because neither party did, there is no waiver.

## II.     The Amended Complaint does not allege a basis for subject matter jurisdiction under the commercial activity exception.

As we understand it, Strategic Tech argues that it has successfully invoked the commercial activity exception to sovereign immunity because (1) it has alleged a cause of action under D.C. law for recognition of a foreign judgment and (2) the underlying activity on which the judgment is based is commercial.   (Dkt. 17 at 16-18).  As argued in our Motion to Dismiss, however, Strategic Tech has not alleged a factual basis for subject matter jurisdiction because Strategic Tech has alleged no commercial activity with any connection to the United States.  (Dkt. 14 at 6-8).

We assume for purposes of this argument that Strategic Tech has sufficiently alleged that a D.C. cause of action exists for recognition of foreign money judgments, and we agree that the FSIA intended foreign states to be liable to the same extent as private individuals under state law. However, as shown, "There is a clearly settled distinction in federal law between statutory provisions that waive sovereign immunity and those that create a cause of action."   (Dkt. 14 at 7, quoting *Cicippio-Puleo v. Islamic Republic of Iran,* 353 F.3d 1024, 1033 (D.C. Cir. 2004)).

It is not enough, as Strategic Tech contends (Dkt 17 at 16-17), that its cause of action have a "*reasonable nexus* or relationship to the United States," or that "one element of the relevant claim *concerns* the ROC's commercial activity in the United States."   (Emphasis added.)   An action brought under the commercial activity exception must be "based upon" the elements of the cause of action, that is "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993).  The cases upon which

Strategic Tech relies are not to the contrary.[4]

Strategic Tech has two choices. It can argue that the claim is based either (1) upon a commercial element of the D.C. cause of action or (2) upon a commercial element in the cause of action on which the Singapore judgment is based. If the second, the argument fails because the Singapore cause of action is not based on a commercial activity with a connection to the United States. The Amended Complaint makes no such allegation. If the first, the claim is not based on any commercial activity. As Strategic Tech alleges, the elements of the D.C. cause of action are (1) that the Singapore courts had personal jurisdiction over the ROC, (2) that they provide for notice, a hearing, a right to counsel, a right to present evidence, confront witnesses, and a right to appeal the

---

[4] We concede that Judge Bates in *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 10 (D.D.C. 2005), uses the "nexus" language quoted, but he was generalizing, not purporting to overrule *Nelson*. It is not enough that Strategic Tech's cause of action have a "reasonable nexus" to the "ROC's commercial activity in the United States." Rather, Strategic Tech must allege that the specific commercial acts on which the suit is based have one of the three connections with the United States detailed in §1605(a)(2). On this point, the two cases that Strategic Tech cites (Dkt. 17 at 16) in fact support the ROC's position. In *America West Airlines, Inc. v. GPA Group, Ltd.,* 877 F.2d 793 (9th Cir. 1989), and *Shapiro v. Republic of Bolivia,* 930 F.2d 1013, 1018 (2d Cir. 1991), the courts required that "The commercial activity relied upon . . . to establish jurisdiction must be the activity upon which the lawsuit is based. ... The focus must be solely upon 'those *specific* act that form the basis of the suit.'" *American West* at 796-97 (emphasis in original); *see also Shapiro* 1018 (focus is "not on whether the foreign state generally engages in commercial activity in the United States but on whether the particular conduct giving rise to the claim is part of the commercial activity having substantial contact with the United States.").

Nor is it enough (Dkt. 17 at 16) for one element of the claim to "concern" any commercial activity by the ROC in the United States. Again, the cases cited by Strategic Tech on this point support the ROC. In both *BP Chems. Ltd. v. Jiangsu Sopo Corp.,* 285 F.3d 677 (8th Cir. 2002), and *Sugimoto v. Exportadora de Sal, S.A.,* 19 F.3d 1309 (9th Cir. 1994), the courts did not analyze whether the claim "concerned" any commercial activity in the United States but whether any of the elements of plaintiffs' claims were "*based upon commercial activity carried on in the United States*" by the foreign nation. *BP Chems. Ltd.,* 285 F.3d at 682 (emphasis added); *Sugimoto,* 19 F.3d at 1311 (finding an element of plaintiff's claim – "tortious flying of the plane in United States air space" – "consists in conduct that occurred in commercial activity carried on in the United States").

Nor does the quote from *Aquamar, S.A. v. Del Monte Fresh Produce, N.A., Inc.*, 179 F.3d 1279, 1293 (11th Cir. 1999), (Dkt. 17 at 17), "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances," assist Strategic Tech. It does not follow from the existence of a cause of action that there is subject matter jurisdiction. *Cicippio-Puleo, supra*, 353 F.3d at 1033.

decision, and (3) that a final, fully enforceable judgment exists under the laws of Singapore.   (Dkt.

17 at 17).   Strategic Tech does not argue that any of these elements is commercial, nor could it

plausibly do so.   Court proceedings are quintessentially sovereign acts.

The   only   precedent   we   have   found   supports   our   conclusion.      In   *Transatlantic*

*Shiffahrtskontor GmbH v. Shanghai Foreign Trade Corp.,* 204 F.3d 384 (2d Cir. 2000), the court

wrote:

> For even assuming that foreign judgments, or the assignment of them, can ever satisfy the
> "based upon" requirement, if the acts upon which the assigned judgments are themselves
> grounded do not meet the "based upon" requirement of §  1605(a)(2) of the FSIA -- i.e.,
> where they are not acts taken in connection with a commercial activity that caused a direct
> effect in the United States -- an action to enforce the foreign judgments in U.S. courts must
> fail for lack of subject matter jurisdiction. [*Id.* at 389]

Any other view would not make sense.   On Strategic Tech's argument, judgments based on activity

with no connection to the United States could be brought in U.S. courts.   The careful structure of

the commercial activity exception shows this is not what Congress intended.   We have found no

case, and Strategic Tech has cited none,  in which a U.S. court has enforced a foreign judgment on

such a theory.   As noted by the D.C. Circuit in *Creighton*, *supra*, quoting the Second Circuit in

*Seetransport*, *supra*, jurisdiction over foreign states trenches on "sensitive foreign relations."    If

judgments such as this one could be enforced in U.S. courts, that "could vastly increase the

jurisdiction of the federal courts over matters involving sensitive foreign relations," *Creighton,*

*supra,* at 312, with no, or at the very least, no Congressionally recognized, benefit to the United

States.

**CONCLUSION**

For all the foregoing reasons, as well as for the reasons set out in our Motion to Dismiss, we

ask that the Amended Complaint be dismissed with prejudice.

Respectfully submitted,

/s/ Thomas G. Corcoran, Jr.
Thomas G. Corcoran, Jr.
D.C. Bar No. 143693
Laina C. Wilk
D.C. Bar No. 477412
Berliner, Corcoran & Rowe, LLP
1101 17th Street, Northwest
Suite 1100
Washington, DC 20036
Telephone: (202) 293-5555
Fax: (202) 293-9035
E-mail: tgc@bcr-dc.com

January 16, 2007